UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

TRAVIS WOODS,
an individual,

                         Plaintiff,

v.                                          Case No.:  6:20-cv-539 (FJS/ATB)

CENTRO OF ONEIDA, INC.,
CENTRAL NEW YORK REGIONAL
TRANSPORTATION AUTHORITY,

                         Defendants.

## MEMORANDUM IN SUPPORT OF
## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Respectfully Submitted

**Bizer & DeReus**
*Attorneys for Plaintiffs*
Andrew D. Bizer (NY # 520676)
andrew@bizerlaw.com
3319 St. Claude Ave.
New Orleans, LA 70117
T: 504-619-9999; F: 504-948-9996

By: */s/ Andrew D. Bizer*
          ANDREW D. BIZER

## <u>TABLE OF CONTENTS</u>

TABLE OF CONTENTS……………………………………………………………………ii

I.   INTRODUCTION ................................................................................................. 1

II.  FACTS ................................................................................................................. 3

   A.   Mr. Woods Desires to Use the Bus Stops System in Utica, New York, Learns the Bus Stops are Inaccessible, and Attempts to Resolve the Issue Without Litigation. ................. 3

   B.   Defendants' Fixed Route Transportation Service is Inaccessible Because of the Pervasive Inaccessibility of the Bus Stops. ......................................................................... 6

   C.   Defendants Have Not Taken Any Steps to Remediate the Bus Stops or Adopt an Alternative Proposal to Cure the Discriminatory Impact of the Barriers. .......................... 7

   D.   Defendants Designated the Inaccessible Bus Stops as "Accessible" After the Passage of the ADA. ....................................................................................................... 9

III. LAW ................................................................................................................... 10

   A.   Making Public Transportation Systems Accessible for Persons with Disabilities Was a Key Component of the Americans With Disabilities Act ................................................ 10

   B.   Summary of the Elements of an ADA Claim. ................................................. 11

   C.   Failure to Provide a Reasonable Accommodation Constitutes Discrimination. ............... 12

   D.   Failure to Provide Program Access Constitutes Discrimination. ....................................... 13

   E.   Failure to Modify Bus Stops in Compliance with the ADA Constitutes Discrimination. . 15

   F.   The Department of Transportation has Defined an Accessible Bus Stop. ......................... 16

IV.  ANALYSIS .......................................................................................................... 18

   A.   Mr. Woods is a Qualified Individual with a Disability Under the ADA ........................... 18

   B.   Mr. Woods Has Standing to Pursue Injunctive Relief. ....................................................... 18

   C.   Defendants' Failure to Provide a Reasonable Modification Constitutes Discrimination. . 21

   D.   Defendants' Failure to Provide Program Access Constitutes Discrimination. .................. 22

     1)   Defendants' "Solution"—that Mr. Woods be Pick Up and Dropped Off in Driveways and Intersections—is Unsafe and Unreasonable. ................................................................... 24

2) Paratransit is a Completely Different Service and is Not a Substitute for an Accessible Fixed Route Transportation Service. .............................................................. 26

3) Under the Program Access Standard, a Public Entity Cannot "Do Nothing". ................. 29

E. Defendants' Failure to Comply with the New Construction/Alteration Requirements Constitutes Discrimination................................................................................... 30

F. Plaintiff Experienced Discrimination by Reason of His Disability ................................. 32

G. Defendants Are Public Entities Under Title II of the ADA and Are Responsible for Their Fixed Route Transportation Service. .............................................................. 32

H. Defendants are The Recipients of Federal Funds and Thus are Covered by the Rehabilitation Act. ............................................................................................... 33

V. CONCLUSION........................................................................................... 34

CERTIFICATE OF SERVICE……………………………………………………………..34

### I.    __INTRODUCTION__

Travis Woods is a qualified individual with a disability as defined by the Americans with Disabilities Act ("ADA"), but he does not let his disability define him. Rather, Mr. Woods tries to live his life just like anyone else born and raised in Utica, New York as he enjoys visiting lifelong friends and family. However, while able-bodied citizens of Utica are free to catch the bus at a moment's notice, Mr. Woods cannot because ninety-one (91%) percent bus stops in Utica are dangerously inaccessible, despite bearing the international symbol accessibility along with the words "ACCESSIBLE STOP". Defendants' failure to provide Mr. Woods with meaningful access to its fixed route bus system constitutes discrimination under Title II of the ADA and the Rehabilitation Act of 1973 ("RA").

Prior to filing suit, Mr. Woods identified that most of the bus stops in Utica are inaccessible – mainly because the bus stops fail to have flat, level concrete landing pads to safely board and alight the fixed route busses owned and operated by Defendants. Mr. Woods attempted to resolve his accessibility concerns without litigation by making a written request for accommodation wherein he stated, "Please be advised that there is widespread non-compliance with the ADA and RA when it comes to the landing pads at the CNYRTA bus stops. To be clear: most of the bus stops I have encountered either do not have big enough landing pads or have no landing pads at all, in violation of the ADA and RA." In response, Defendant took no steps to make their transportation system accessible and, instead, they advised Mr. Woods that he would have to be dropped off in active driveways and thoroughfares if there are no safety issues present. Defendants told Mr. Woods he was on his own to determine what was bus stops were safe and what bus stops were unsafe and that he should tailor his travels accordingly.

Unsatisfied with the prospects of risking his life to ride the bus, Mr. Woods filed suit. After an inspection, Mr. Woods' expert concluded that ninety-one (91%) percent of Defendants'

bus stops are inaccessible. Despite this survey (the veracity of which Defendants do not dispute), Defendants doubled down, maintaining that Mr. Woods should risk his life by getting dropped off in the middle of intersections, driveways or grass. According to Defendants' employees and expert, it is up to the <u>wheelchair user</u> to "eyeball it" when no accessible landing pad exists. This "solution" is not reasonable, is not safe, and is most certainly not a defense under the ADA.

Furthermore, Defendants have modified and altered the bus stops used in their fixed route transportation system by erroneously designating most of the stops as accessible with the words "ACCESSIBLE STOP". Despite labeling these stops as accessible, Defendants did not fix the underlying inaccessibility.

Mr. Woods has three theories of liability, any one of which would be sufficient for this Court to grant summary judgment in his favor. First, Defendants have failed to provide Mr. Woods with a reasonable modification. Second, Defendants have failed to provide Mr. Woods with program access. Third, Defendants have failed to comply with the alteration requirement of the ADA, namely, 28 C.F.R. §37.43(a)(1).

The ADA was passed over thirty years ago and yet Defendants have not made their fixed-route bus system accessible to wheelchair users.[1] When Mr. Woods made a pre-suit request that Defendants bring the bus stops into compliance, Defendants again failed to act. Defendants argue that Mr. Woods should be relegated to an unsafe and dangerous "solution" under which he enters and exits buses in driveways and thoroughfares, risking life and limb. Defendants have failed to comply with the ADA/RA and summary judgment should issue.

---

[1] The ADA was signed into law on July 26, 1990.

II.    <u>**FACTS**</u>

Travis Woods is a paraplegic who uses a wheelchair to ambulate. Mr. Woods wishes to use the Centro fixed-route bus system in his hometown of Utica but cannot because ninety-one (91%) percent bus stops in Utica are dangerously inaccessible by not having accessible landing pads for Mr. Woods to safely board and alight. Because of this, Mr. Woods sent a reasonable accommodation request to Defendants, advising of "widespread non-compliance with the ADA and RA when it comes to the landing pads at the CNYRTA bus stops." Mr. Woods went on to provide specific examples of noncompliant bus stops and then requested that compliant landing pads be constructed. Defendant responded by telling Mr. Woods that he would have to be dropped off in active driveways and thoroughfares, if there are no safety issues present.

A.    <u>**Mr. Woods Desires to Use the Bus Stops System in Utica, Learns the Bus Stops are Inaccessible, and Attempts to Resolve the Issue Without Litigation.**</u>

Travis Woods is a T-4 paraplegic due to a gunshot wound to his back.[2] The bullet is still lodged in his spinal cord to this day.[3] Mr. Woods cannot walk or stand and uses a wheelchair for mobility.[4] Despite this, Mr. Woods prides himself on his independence.[5] Mr. Woods also prides himself on born and raised in Utica.[6] Mr. Woods has family members throughout Utica.[7] Because of his independent travels around Utica, Mr. Woods is aware of the lack of safe, accessible landing pads by which to board and alight the Centro fixed-route bus system.[8] The lack of accessible landing pads have prevented, and are currently preventing Mr. Woods from using the fixed route bus system in Utica. In his deposition, Mr. Woods summed it up succinctly:

---

[2] *See* Exhibit "A", Deposition of Travis Woods, at 9:25-10:1.
[3] Ex. "A", Woods depo., at 10:7-8.
[4] Ex. "A", Woods depo., at 10:25-11:7.
[5] Ex. "A", Woods depo., at 23:17-20.
[6] Ex. "A", Woods depo., at 7:24.
[7] Ex. "A", Woods depo., at 38:6-12.
[8] Ex. "A", Woods depo., at 38:6-12.

"There's no landing pad…you have to have one there. There's nothing there but danger. That's what you get from all these bus stops. That's why I can't continue on getting on the bus stop. If the bus stops was correct for me to get on there, I would continue on."[9]

According to Mr. Woods, "the bus stops are like distant islands. You can't get to it."[10] Frustrated with the bus stops that were completely lacking landing pads, on April 3, 2020, Mr. Woods made a reasonable accommodation request to the Defendants via email (the "Reasonable Accommodation Request").

"I am a qualified individual with a disability under Title II of the ADA, 42 U.S.C. § 12131 et seq., and the Rehabilitation Act, 29 U.S.C. § 794, et seq. I am paraplegic and am substantially impaired in major life activities. I require a wheelchair for mobility. This is a request for a reasonable accommodation.

Please be advised that there is widespread non-compliance with the ADA and RA when it comes to the landing pads at the CNYRTA bus stops. To be clear: most of the bus stops I have encountered either do not have big enough landing pads or have no landing pads at all, in violation of the ADA and RA. A few examples in Utica include: the bus stop at by my doctor, Dr. Kodsy, at 1703 Genesee Street; the bus stop at my pharmacy Parkway Drugs, at 350 Leland Ave; all the bus stops that serve Proctor Park; the bus stop at the 900 block of Matthews Avenue where many of my friends live; and the bus stop near the McDonalds near my apartment located at 171 N. Genesee St.

It has been nearly 30 years since the passage of the ADA. I expect that you will remedy the ADA violations and bring the landing pads into compliance with the requirements, provisions, and regulations of the ADA and the Rehabilitation Act within thirty (30) days."[11]

The bus stops identified in the Reasonable Accommodation Request were all bus stops that Mr. Woods personally tried to access, but could not because they lacked compliant landing pads.[12] Mr. Woods' Reasonable Accommodation Request ended up on the desk of Joshua

---

[9] Ex. "A", Woods depo., at 24:8-13.
[10] Ex. "A", Woods depo., at 31:23-24.
[11] *See* Exhibit "B", Affidavit of Travis Woods, *see also* Exhibit "N", April 3, 2020 email.
[12] Ex. "A", Woods depo., 17:17-23.

Gardener, the Defendants' ADA Complaint Officer.[13] Mr. Gardener is also the Specialized Transportation Manager who manages the paratransit department.[14] Mr. Gardener did not physically go to the bus stops identified in the Reasonable Accommodation Request.[15] Instead, Mr. Gardener went to Google Maps and determined that "there were safe locations to let the customer off that were <u>near</u> the bus stop." (emphasis added)[16] Mr. Gardener did not examine the bus stops to see if there existed landing pads or if the landing pads were the proper size.[17] Mr. Gardener determined that not all stops have to have landing pads because he believed they were "grandfathered in."[18]

Mr. Gardener took no additional steps to determine if there was indeed "widespread noncompliance with the ADA".[19] Mr. Gardener only briefly discussed his response to the Reasonable Accommodation Request with Joe DeGray, the Senior Vice President of Operations.[20] Mr. DeGray admitted in his deposition that he does not know what makes a bus stop ADA compliant.[21] Mr. DeGray could not even identify what a bus landing pad was.[22]

After doing next to no research to confirm or deny Mr. Wood's claims of "widespread noncompliance with the ADA," on April 20, 2020, Mr. Gardener responded to Mr. Woods:

> We have received your ADA complaint regarding accessible landing pads at specific bus stops in Utica. At a few of these sites, there are curb cuts within feet of the bus stop where drivers can put the ramp down and allow for safe entering and exiting of the vehicle. At a few of the other locations, there are no sidewalks. In cases like these, drivers can drop off at the

---

[13] *See* Exhibit "C" Joshua Gardener deposition, at 9:11.
[14] Ex. "C", Gardener depo., at 8:4-20.
[15] Ex. "C", Gardener depo., at 27:4-6.
[16] Ex. "C", Gardener depo., at 28:13-20.
[17] Ex. "C", Gardener depo., at 30:3-9.
[18] Ex. "C", Gardener depo., at 30:3-9.
[19] Ex. "C", Gardener depo., at 59:22-60:2.
[20] Ex. "C", Gardener depo., at 60:3-9.
[21] *See* Exhibit "D" Joseph DeGray deposition, at 17:8-17.
[22] Ex. "D", DeGray depo., at 17:24-18:11.

5

driveway entrance of the location. For example, at Parkway Drugs there is no sidewalk. At this location, we can have the driver stop at the driveway entrance to let you off. We also allow for courtesy stops along the route. If you would like to be dropped off somewhere other than the stop, please ask the driver when boarding the vehicle. If there are no safety issues present, we will accommodate courtesy stops.[23]

**B.    Defendants' Fixed Route Transportation Service is Inaccessible Because of the Pervasive Inaccessibility of the Bus Stops.**

Mr. Woods' claim that there was "widespread noncompliance with the ADA" was confirmed by Mr. Woods' expert, Nicholas Heybeck. On September 23 and 24 of 2020, Mr. Heybeck inspected one hundred fifteen (115) of Defendants' bus stops in Utica.[24][25] Mr. Heybeck did not inspect every single bus stop. Rather, Mr. Heybeck began by inspecting the bus stops that were the most heavily used as those stops would best represent the system in its entirety.[26] He then moved onto a sampling of the bus stops in a more residential area towards the ends of the bus lines.[27] At each bus stop he inspected, Mr. Heybeck would look to determine what type of features were located at the bus stop and document those features or lack of features.[28] He looked to see if the bus stop had an adjacent sidewalk, if there was a boarding and alighting area, and if there was a shelter and then determined whether those features met the

---

[23] Exhibit "E", *see also* Ex. "D", DeGray depo., at 9:11-13; 33:21-35:13, *see also* Ex. "B" Affidavit of Travis Woods.

[24] Exhibit "F," Heybeck report, at ¶ 2. *See also* Ex. "O", Affidavit of Nicholas Heybeck.

[25] Mr. Heybeck also inspected the length of the ramp on the bus. As he explained in his deposition, "I measured how far the physical ramp would extend from the city busses so I would know basically how far the boarding and alighting area could be from the curb line…so if the bus pulled up right adjacent to the curb, you know, how far could the ramp extend to reach the boarding and alighting area. So with that in mind, I measured how long that ramp would be, and then I could take measurements at each stop if there was just a sidewalk and I could measure how far that sidewalk was from the curb line to determine if it potentially could be used for a boarding and alighting area. And then I could also measure the width of the sidewalk, because there is measurement requirements, width and length requirements for the boarding and alighting area." *See* Exhibit "G", Nicholas Heybeck Deposition, at 28:13-29:9.

[26] Ex. "G", Heybeck depo., at 19:19-20:1.

[27] Ex. "G", Heybeck depo., at 20:4-8.

[28] Ex. "G", Heybeck depo., at 22:1-9.

scoping and technical standards of the ADA.[29] Mr. Heybeck wrote in his expert report:

> "After inspecting and taking measurements of the Defendant's bus stops, **it is my opinion that 105 of the 115 or 91% of the bus stops inspected do not meet the technical specifications set forth by the USDOT and Federal Highway Authority.** It is my further opinion that the bus stops contain a number of barriers that deviate significantly from what the ADA proscribes, as evidenced by "Exhibit B". Based on the high percentage of non-compliance observed, it is my opinion that the bus stop program, when viewed in its entirety does not meet the design and scoping standards of the ADA." [30] (emphasis original).

The aforementioned "Exhibit B" ncludes photos and measurements of the one hundred fifteen (115) bus stops surveyed.[31] It shows that sixty (60) of the bus stops Mr. Heybeck inspected either have no boarding area whatsoever, have boarding areas that cannot be physically reached by the bus ramps, or boarding areas that were not the required minimum 60" by 96" dimensions.[32] When the bus stops had landing pads that were the proper distance from the curb and met the required size, thirty nine (39) of those landing pads either contained a slope that exceeded the maximum required 2.1% in all directions or contained changes in level that exceeded the maximum ¾" (or generally contained cracked and poor concrete).[33]

### C.   Defendants Have Not Taken Any Steps to Remediate the Bus Stops or Adopt an Alternative Proposal to Cure the Discriminatory Impact of the Barriers.

Despite the evidence that the overwhelming majority of the bus stops in Utica lack compliant landing pads, Defendants have done nothing. Instead, Defendants have flipped their obligation that the fixed-route bus system have safe and compliant bus stops onto Utica's

---

[29] Ex. "G", Heybeck depo., at 22:10-19.
[30] Exhibit "F," Heybeck Report, at ¶ 31.
[31] *See* Exhibit "H", Heybeck violations table.
[32] *See* Exhibit "H" Heybeck violations table, bus stop ID #1; 4; 5; 10; 13-15; 18-19; 21; 27; 32-33; 44-46; 48; 51-52; 57; 63; 67-72; 74; 76; 80-95; 97-105; 107; 109; 111; 112; 114-115.
[33] *See* Exhibit "H" Heybeck violations table, bus stop ID #11-12; 16; 20; 23-26; 28-31; 34-36; 38-39; 43; 47; 49-50; 53-56; 58-60; 62; 64-65; 73; 75; 77-79; 106; 110; 113.

wheelchair users. Instead of modifying their bus stops, Defendants place the onus on Mr. Woods and to "eyeball" the situation to see if it is safe to board and alight the busses.

Defendants hired David Rishel as their expert in an effort to rebut Mr. Heybeck. Mr. Rishel has never been admitted as an expert in Federal Court. According to Mr. Rishel, he has, "never done more than a deposition."[34] <u>Mr. Rishel did not dispute any of Mr. Heybeck's measurements pertaining to the bus stops.</u> [35] Mr. Rishel did not go out and inspect the bus stops or take any measurements.[36] In Mr. Rishel's report, he speculates that Mr. Heybeck's slope measurements could be incorrect due to debris, however in his deposition, Mr. Rishel admitted that he could not tell from Mr. Heybeck's photos if there was indeed debris impacting the slope measurements.[37] Mr. Rishel offered no measurements to dispute Mr. Heybeck's measurements.[38] Mr. Rishel did not analyze whether Centro had the sufficient funds to install complaint landing pads and did not analyze whether Centro had the ability to raise the sufficient funds to install compliant bus stops.[39] Mr. Rishel did nothing to determine whether Centro can or cannot bring their bus stops in compliance with the ADA.[40] Mr. Rishel did no research as what entity owns the land surrounding the bus stops in Utica.[41]

Instead of rebutting any of Mr. Heybeck's findings, Mr. Rishel's sole role as an expert seems to be to simply echo the Defendants' claims that the wheelchair users should take matters into their own hands to determine where it is safe to board and alight in absence of landing pads. In his expert report and in his deposition, Mr. Rishel made numerous "suggestions" as to specific

---

[34] Exhibit "I", Deposition of David Rishel, at 14:17-19.
[35] Ex. "I", Rishel depo., at 21:12-15.
[36] Ex. "I", Rishel depo., at 21:8-11
[37] Ex. "I", Rishel depo., at 21:16-22:1.
[38] *See* Exhibit "J,", Expert Report of David Rishel, *In Globo*.
[39] Ex. "I", Rishel depo., at 28:14-29:23.
[40] Ex. "I", Rishel depo., at 30:3-13.
[41] Ex. "I", Rishel depo., at 33:8-13.

intersections and driveways that wheelchair users could board and alight when faced with the lack of landing pads.[42] Mr. Rishel did not take any measurements of those driveways and intersections to determine whether they are safe – he did nothing to determine if the driveways and intersections contained excessive slopes, debris, or were free from uneven changes in level.[43]

### D. Defendants Designated the Inaccessible Bus Stops with Signage Stating "ACCESSIBLE STOP" After the Passage of the ADA.



In a 30(b)(6) deposition, Joseph DeGray admitted that shorty after April 1, 2015, the international symbol of accessibility along with the words "ACCESSIBLE STOP" were added to the signage on the physical bus stops in Utica.[44] [45] The corporate representative could not identify any efforts that were made to determine whether the bus stops actually meet the requirements of the ADA.[46] The corporate representative claimed that these stops were marked as accessible to indicate that the _busses_, not the actual bus stop, were accessible.[47] But this assertion is belied by the very text of the signs, which clearly state that the _stops_ themselves are accessible.

Similarly, the Centro bus maps/schedules were modified in 2019 to include the international symbol of accessibility on nearly every bus stop.[48] According to the corporate representative, the symbols of accessibility next to the bus stops on the maps do not imply that

---

[42] _See_ Ex. "J" pages 11-28; _See_ Ex. "I", Rishel depo., at 57:12-20.
[43] Ex. "I", Rishel depo., at 57:12-58:11.
[44] Exhibit "K", Rule 30(b)(6) Deposition, at 7:3-16.
[45] The photo above was taken from Ex. "J" at page 19 and is representative of the signage referred to in the 30(b)(6) deposition.
[46] Ex. "K", 30(b)(6) depo., at 8:24-9:2
[47] Ex. "K", 30(b)(6) depo., at 8:2-12.
[48] Ex. "K", 30(b)(6) depo., at 18:14-19:6.; _see also_ Exhibit "L", Bus Schedules.

those bus stops are accessible.[49] Rather, "They are being listed as a reference to the accessibility

on the back page of the schedule, which says that all vehicles we own are accessible."[50]

### III.    LAW

#### A.    Making Public Transportation Systems Accessible for Persons with Disabilities Was a Key Component of the Americans With Disabilities Act

It has been over thirty years since Congress enacted the ADA to "provide a clear and

comprehensive national mandate for the elimination of discrimination against individuals with

disabilities," and to assure "equality of opportunity, full participation, independent living, and

economic self-sufficiency for [individuals with disabilities]."    42 U.S.C. § 12101(a)(7) and

(b)(1).  In passing the ADA, Congress found that "historically, society has tended to **isolate** and

segregate individuals with disabilities, and, despite some improvements, such forms of

discrimination against individuals with disabilities continue to be a serious and pervasive social

problem". (emphasis added) 42 U.S.C. §12101(a)(2).

Improving transportation services for disabled persons is a key component of the ADA.

See 42 U.S.C. § 12101. The House Committee on Education and Labor noted that

"[t]ransportation is the linchpin which enables people with disabilities to be integrated and

mainstreamed into society." H.R.Rep. No. 485(II), at 37, (1990), reprinted in 1990 U.S.C.C.A.N.

303, 319 (observing that testimony of Executive Director of President's Committee on

Employment of People with Disabilities echoed the same: "inaccessible transportation has been

identified the major barrier, second only to discriminatory attitudes"); accord, H.R.Rep. No.

485(IV), at 25, (1990), reprinted in 1990 U.S.C.C.A.N. 512, 514 (Committee on Energy and

Commerce noted that: "[Transportation] is a veritable lifeline to the economic and social benefits

---

[49] Ex. "K", 30(b)(6) depo., at 19:12-13.
[50] Ex. "K", 30(b)(6) depo., at 19:13-16.

that our Nation offers its citizens ... For this reason, the National Council on Disability has declared that 'accessible transportation is a critical component of a national policy that promotes self-reliance and self-sufficiency of people with disabilities.' ").

**B.    Summary of the Elements of an ADA Claim.**

To establish a violation of Title II of the ADA, a plaintiff must show "(1) that he is a 'qualified individual' with a disability; (2) that he was excluded from participation in a public entity's services, programs or activities or was otherwise discriminated against by a public entity; and (3) that such exclusion or discrimination was due to his disability." *Hargrave v. Vermont*, 340 F.3d 27, 34–35 (2d Cir. 2003) (cleaned up). "[T]itle II applies to anything a public entity does." 28 C.F.R. § Pt. 35, App. B (2011). "[T]he phrase 'services, programs, or activities' has been interpreted to be 'a catch-all phrase that prohibits all discrimination by a public entity.' " *Noel v. New York City Taxi & Limousine Comm'n*, 687 F.3d 63, 68 (2d Cir. 2012) (quoting *Innovative Health Sys., Inc. v. City of White Plains*, 117 F.3d 37, 45 (2d Cir. 1997)). Moreover, under the ADA, a covered transportation entity "under Section 12184 is subject not just to the narrow requirements associated with the purchase of new vehicles, but the statute's broader anti-discrimination mandate." *Crawford v. Uber Techs., Inc.*, No. 17-CV-02664-RS, 2018 WL 1116725, at *4 (N.D. Cal. Mar. 1, 2018); *Henrietta D. v. Bloomberg*, 331 F.3d 261, 279 (2d Cir. 2003) (explaining in an ADA/RA case that it is a familiar canon of statutory construction that remedial legislation must be broadly construed).

As will be discussed in detail below, Defendants failed to comply with the ADA's broad anti-discrimination mandate because they: (a) failed to provide a reasonable modification; (b) failed to provide program access; and (c) failed to modify their bus stops in compliance with the ADA requirements for new construction / modification.

Finally, it is important to note that in an ADA/RA claim where the plaintiff seeks <u>injunctive</u> relief, the plaintiff need not establish that the discrimination was intentional. See *Garcia v. S.U.N.Y. Health Scis. Ctr. of Brooklyn*, 280 F.3d 98, 115 (2d Cir.2001) (holding that private damage claims under Title II of the ADA require proof of discriminatory animus or ill will, but that no such showing is required in actions for injunctive relief)[51]; *Davis v. Shah*, 821 F.3d 231, 260 (2d Cir. 2016) ("While claims for damages under Title II require proof of discriminatory animus, claims for injunctive relief demand no such showing"); *McCullum v. Orlando Reg'l Healthcare Sys., Inc.*, 768 F.3d 1135, 1147 fn. 8 (11th Cir. 2014) ("Where a plaintiff is not seeking compensatory damages, discriminatory intent is not required.").

## C.    Failure to Provide a Reasonable Accommodation Constitutes Discrimination.

The Second Circuit has explained that "the demonstration that a disability makes it difficult for a plaintiff to access benefits that are available to both those with and without disabilities is sufficient to sustain a claim for a reasonable accommodation." *Henrietta D.*, 331 F.3d at 277. "[T]he determination of whether a particular modification is 'reasonable' involves a fact-specific, case-by-case inquiry that considers, among other factors, the effectiveness of the modification in light of the nature of the disability in question and the cost to the organization that would implement it." *Staron v. McDonald's Corp.*, 51 F.3d 353, 356 (2d Cir.1995) (applying same standard in Title III ADA case as under Rehabilitation Act). It is a factual issue "whether [a] plaintiff['s] proposed modifications ... amount to 'reasonable modifications' which should be implemented, or 'fundamental alterations,' which the state may reject." *Crowder v. Kitagawa*, 81

---

[51] Moreover, in that same holding, the Court explained that, as to damages claims brought under § 504, "deliberate indifference remains the necessary showing for § 504 claims since the Rehabilitation Act was enacted pursuant to Congress's Spending Clause authority and therefore does not require that damage remedies be tailored to be congruent and proportional to the proscriptions of the Fourteenth Amendment." *Id.* at 115.

F.3d 1480, 1485 (9th Cir. 1996). "Rules, policies, or practices… are subject to the requirement of reasonable modification," but that "essential eligibility requirements" are not. *Mary Jo C. v. New York State & Loc. Ret. Sys.*, 707 F.3d 144, 156 (2d Cir. 2013).

The reasonable modification/accommodation requirement has been found to apply where access to a service is impeded by physical inaccessibility. In *Disabled in Action v. Bd. of Elections in City of New York*, the Second Circuit evaluated whether the board of elections provided a reasonable accommodation in the form of meaningful access to its voting program. 752 F.3d 189, 200-01 (2d Cir. 2014). The Court found that the polling places were plagued with physical barriers and that the defendant failed to provide individuals with meaningful access to its voting program. *Id*. The defendant argued that no alternative accessible locations existed and that, therefore, there was "no reasonable accommodation that can be made[.]" *Id*. at 200. The Court handily rejected this argument, explaining:

> "to find that BOE's responsibilities end where the very discriminatory effects of architectural and other barriers to access begin would not only frustrate the 'clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities,' *Henrietta D.*, 331 F.3d at 272 (quoting 42 U.S.C. § 12101(b)(1)), but directly contradict the purpose of the Acts."

> *Id*. at 201.

Therefore, even where the lack of accessibility is caused by physical barriers, the reasonable accommodation requirement still applies.

### D.    Failure to Provide Program Access Constitutes Discrimination.

As stated by the Supreme Court, "in the case of older facilities, for which structural change is likely to be more difficult, a public entity may comply with Title II by adopting a variety of less costly measures, including relocating services to alternative, accessible sites and assigning aides to assist persons with disabilities in accessing services." *Tennessee v. Lane*, 541 U.S. 509, 531–32, 124 S.Ct. 1978, 158 L.Ed.2d 820 (2004).

13

Under the "program access" test, "[w]hile proving that particular barriers exist might not be sufficient to establish Title II liability, each barrier is a building block for a finding that the [service, program, or activity], viewed in its entirety, is not readily accessible." *Pascuiti v. New York Yankees*, 87 F. Supp. 2d 221, 224 (S.D.N.Y. 1999); see also *id.* ("[A]n important part of the program access requirement for the [service, program, or activity] is whether all services available for the use of non-disabled patrons also are available for [the] use of disabled patrons."). By way of example, in *Am. Council of Blind of New York, Inc. v. City of New York* the court evaluated whether the City of New York afforded the blind meaningful access to its signalized intersections. 495 F. Supp. 3d 211, 219 (S.D.N.Y. 2020). The court determined that, in light of the fact that 95% of signalized crossings contained signals accessible only to sighted persons, the City was "clearly not" in compliance. *Id.* at 237; see also, *Henrietta v. Bloomberg*, 331 F.3d 261, 275 (2d Cir.2003) (explaining that the court looks at "whether the plaintiffs with disabilities could achieve meaningful access").

Other courts have explained that merely being able to enter a facility where a program is being offered does not absolve a public entity of liability. *Chaffin v. Kan. State Fair Bd.*, 348 F.3d 850, 861 (10th Cir. 2003) ("We therefore do not agree with Defendants that mere physical presence on the fairgrounds—at least when coupled with being effectively trapped in a handicapped section, unable to leave for food or to use the restroom, unable to view the stage, and subjected to being climbed over, stepped on, and bumped into by other attendees—amounts to anything other than a denial of the benefits of the fair."); see generally, *Doctor's Associates, Inc.*, 14-CV-2980, 2016 WL 852458, at *6 (E.D. La. Mar. 4, 2016) ("Simply because the

Plaintiff ultimately achieved his goal of making a purchase does not mean that he did so in a manner comparable to that of non-wheelchair-using patrons").[52]

A public entity must take affirmative steps to their programs and services in the most integrated setting appropriate. See generally, *Gaylor v. Georgia Dep't of Nat. Res.*, 2013 WL 4790158, at *7 (N.D. Ga. Sept. 6, 2013) (citing *Shotz v. Cates*, 256 F.3d 1077, 1080 (11th Cir.2001). Other courts have held that the failure to provide program access to bus stops can constitute discrimination. *Falls v. Bd. of Commissioners of New Orleans Reg'l Transit Auth.*, No. CV 16-2499, 2017 WL 2730781, at *4 (E.D. La. June 26, 2017) (concluding that the defendant transit authority violated the program access requirement as to bus stops, explaining "[g]iven the pervasive non-compliance and the Plaintiffs' difficulties in accessing the bus stops, the Court finds that in its entirety the Plaintiffs were denied access and thus discriminated against."); *Belinski v. City of San Bernardino*, No. CV088571PSGMANX, 2010 WL 11596645, at *6 (C.D. Cal. Jan. 27, 2010)(finding a genuine issue of material fact on program access where three (3) of eighteen (18) bus stops were pre-ADA and were non-compliant).

### E.    Failure to Modify Bus Stops in Compliance with the ADA is Discrimination.

Where an entity modifies a facility after the passage of the ADA, but fails to bring the modified facility into compliance, that failure constitutes discrimination. *Scharff v. Cty. of Nassau*, No. 10 CV 4208 DRH AKT, 2014 WL 2454639, at *8 (E.D.N.Y. June 2, 2014) (quoting *Kinney v. Yerusalim,* 9 F.3d 1067, 1071 (3rd Cir.1993)) ("the regulations concerning new construction and alterations are substantially more stringent.... This obligation of accessibility for alterations does not allow for non-compliance based upon undue burden.").

---

[52] While *Doctor's Associates, Inc.* is a Title III case, its ultimate holding is equally applicable: The mere fact that a plaintiff is physically able to enter a facility does not mean that discrimination did not occur. Instead, the question is whether the plaintiff's ability to enjoy some service, feature, program, or accommodation was impaired as a result of inaccessible features.

Critically, a change to a physical facility constitutes an "alteration" when the act affects the usability of the facility—and re-designation of a space from "non-accessible" to "accessible" constitutes an alteration. As the court in *Tatum v. Doctor's Assocs., Inc.* explained:

> "Defendant contends that the conversion of general parking spots to accessible parking spots involved only re-painting and thus does not fall within the definition of an alteration. Rec. Doc. 55-3 at 17. However, Defendant ignores a significant portion of the applicable regulation's wording, specifically where it says painting is not an alteration *unless it affects the usability of the facility*. 28 C.F.R. § 36.402(b). Thus, the question is whether converting two parking spots to handicap-accessible spots affects usability. In light of the DOJ's interpretation that the term usability includes changes that relate to access by individuals with disabilities, this Court is convinced that the conversion qualified as an alteration. *See* 28 C.F.R. Pt. 36, App. B. The conversion of the two spots undoubtedly made the facility more accessible to individuals with disabilities by making two more spots available for parking. The Defendants' act created more parking options for individuals using wheelchairs and individuals with other disabilities who require wider parking spaces and spaces closer to the facilities. Under a broad interpretation of the term, this change affected the usability of the spaces, and the property as a whole, by increasing access. Having done so, the act qualified as an alteration, subjecting the Defendant to the "maximum extent feasible" standard. Therefore, the altered portion of the property, the parking spots, must comply fully with applicable accessibility standards unless it is "virtually impossible" to do so. 28 C.F.R. § 36.402(c)."

No. CV 14-2980, 2016 WL 852458, at *4 (E.D. La. Mar. 4, 2016) (emphasis added).

"Even a relatively inexpensive or localized modification may…so fundamentally change the use of a facility that we would regard it as an alteration, particularly if it affects the purpose, function, or underlying structure of the facility." *Roberts v. Royal Atl. Corp.*, 542 F.3d 363, 370 (2d Cir. 2008).

## F.    The Department of Transportation has Defined the Contours of an Accessible Bus Stop.

For existing facilities, the ADA Accessibility Guidelines ("ADAAG") provide objective contours as to whether an existing facility is readily accessible and usable by individuals with disabilities. See, e.g., *Brown v. Cty. of Nassau*, 736 F. Supp. 2d 602, 617 (E.D.N.Y. 2010)

("while the ADAAG regulations clearly are not dispositive in this case, they can still provide guidance as to whether an existing facility is readily accessible and usable by individuals with disabilities.") (citing a litany of cases to this effect).

The ADAAG published by the Department of Transportation ("DOT") includes specifications as to bus stops. The surface of a bus stop shall be firm and stable. *See* 36 C.F.R. § Pt. 1191, App. D., Section 810.2.1 ("Surface. Bus stop boarding and alighting areas shall have a firm, stable surface."). A bus stop shall have a boarding and alighting area that is a minimum of 96" deep and 60" wide. *See* 36 C.F.R. § Pt. 1191, App. D., Section 810.2.2 ("Dimensions. Bus stop boarding and alighting areas shall provide a clear length of 96" minimum, measured perpendicular to the curb or vehicle roadway edge, and a clear width of 60" minimum, measured parallel to the vehicle roadway.").[53] And, perpendicular to the roadway, the surface of a bus stop shall not have a cross slope of more than 2%. *See* 36 C.F.R. § Pt. 1191, App. D., Section 810.2.4 ("Parallel to the roadway, the slope of the bus stop boarding and alighting area shall be the same as the roadway, to the maximum extent practicable. Perpendicular to the roadway, the slope of

---

[53] Figure 810.2.2 visually demonstrates the dimensions of a bus stop boarding and alighting area:



the bus stop boarding and alighting area shall not be steeper than 1:48."). A properly-sized and level landing pad at a bus stop is essential for the safety of individuals in wheelchairs.

## IV.    ANALYSIS

### A.    Mr. Woods is a Qualified Individual with a Disability Under the ADA

Travis Woods is a T-4 paraplegic due to a gunshot wound to his back.[54] The bullet is still lodged in his spinal cord to this day.[55] Mr. Woods cannot walk or stand and uses a wheelchair for mobility.[56] As such, Plaintiff is a qualified individual with a disability under the ADA and Rehab Act. *See* 42 U.S.C. § 12102(1)(A) (disability means "a physical or mental impairment that substantially limits one or more major life activities of such individual") and 42 U.S.C. § 12102(1)(A). Here, Mr. Woods cannot walk or stand because of his paralysis and requires a wheelchair for mobility. This is a per se disability under the ADA. See 28 C.F.R. § 35.108 (d)(2)(iii)(D) ("mobility impairments requiring the use of a wheelchair substantially limit musculoskeletal function"); see, e.g., *Shariff v. Beach 90th St. Realty Corp.*, No. 11-CV-2551 ENV LB, 2013 WL 6835157, at *4 (E.D.N.Y. Dec. 20, 2013) (holding that a paralyzed individual who used a wheelchair was disabled within the meaning of the ADA).

### B.    Mr. Woods Has Standing to Pursue Injunctive Relief.

For a plaintiff to have standing to bring suit, he "must have (1) suffered an injury in fact, (2) that is fairly traceably to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Liu v. U.S. Congress*, 834 F. App'x 600, 602 (2d Cir. 2020) (quoting *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016)). Where plaintiffs seek injunctive relief, they must "also prove that the identified injury in fact presents a 'real and immediate threat' of repeated injury.'" *Kreisler v. Second Ave. Diner Corp.*, 731 F.3d 184, 187

---

[54] Ex. "A", Woods depo., at 9:25-10:1.
[55] Ex. "A", Woods depo., at 10:7-8.
[56] Ex. "A", Woods depo., at 10:25-11:7.

(2d Cir. 2013) (citing *Shain v. Ellison*, 356 F.3d 211, 215 (2d Cir. 2004)). What constitutes an injury in fact under the ADA is that the plaintiff has "personally encounter[ed] the barrier to access complained of, or [ ] has actual knowledge of the barrier complained of and has been deterred from visiting the public accommodation because of that barrier." *Panzica v. Mas – Maz, Inc.*, 2007 WL 1732123, at \*3 (E.D.N.Y. June 11, 2007); *see also Disabled in Action of Metro. N.Y. v. Trump Int'L Hotel & Tower*, 2003 WL 1751785, (S.D.N.Y. Apr. 1, 2003) ("Courts considering ADA claims have found that disabled plaintiffs who had encountered barriers at restaurants, stores, hotels, or stadiums prior to filing their complaints have standing to bring claims for injunctive relief if they show a plausible intention or desire to return to the place but for the barriers to access.").

To plausibly demonstrate the first element of standing, injury, an individual with a disability is not required to "engage in a futile gesture if such person has actual notice that a person or organization covered by this subchapter does not intend to comply with its provisions." 42 U.S.C. § 12188(a)(1). While the Second Circuit has not clearly defined "actual notice," the majority of cases suggest that "actual knowledge" under the futile gesture analysis comes from the plaintiff personally witnessing the alleged accessibility issue. *See Pickern v. Holiday Quality Foods, Inc.*, 293 F.3d 1133 (9th Cir. 2002); *Perdum v. Forest City Ratner Cos.*, 174 F.Supp.3d 706, 715 (E.D.N.Y. 2016); *Shariff v. Radamar Meat Corp*., 2014 WL 1311563, at \*2 (E.D.N.Y. Feb. 14, 2014); *Small v. Gen. Nutrition Cos*, 388 F.Supp.2d 83, 88 – 89 (E.D.N.Y. 2005). Finally, a plaintiff "need not attempt to overcome an obvious barrier" to establish a "concrete and particularized injury." *Kreisler,* 731 F.3d at 188.

Mr. Woods was born in Utica and has lived there his whole life.[57] Mr. Woods was a passenger on a Centro bus once in the last year to go to McDonald's.[58] Mr. Woods was dropped off on the driveway of the McDonalds instead of at the bus stop.[59] Because of the steep slope of the driveway, Mr. Woods was not independently able to get out of the driveway without the assistance of his friend.[60] Mr. Woods also tried to access a Utica public bus at the stop located in the 900 block of Mathews Avenue, but was unable to use that bus stop because it did not have a landing pad.[61] Once Mr. Woods determined that he could not access the bus at that location, he did not make further attempts because he determined that it would be dangerous.[62] Mr. Woods was unable to even physically get to the bus stop because it was located on a grassy surface.[63] Mr. Woods also attempted to use the bus stop at 1 Herkimer Road, but was unable to access the stop because there was a hole blocking his path.[64] Mr. Woods has encountered several additional bus stops in Utica that lacked landing pads that would be dangerous for him to access.[65]

Mr. Woods is deterred from using the Utica public bus because he is put in danger by being dropped off in an active driveway or is physically unable to access the bus stops. Mr. Woods has actual notice that most of the bus stops in Utica are not accessible based on his prior attempts to either exit a public bus or access bus stop that does not have a landing pad or has some other barrier. Mr. Woods is not required to engage in the futile gesture of attempting to

---

[57] Ex. "A", Woods depo., at 7:20-24.
[58] Ex. "A", Woods depo., at 13:19-14:11.
[59] Ex. "A", Woods depo., at 14:21-15:6.
[60] Ex. "A", Woods depo., at 15:7-15.
[61] Ex. "A", Woods depo., at 16:13-20.
[62] Ex. "A", Woods depo., at 19:9-13.
[63] Ex. "A", Woods depo., at 19:21-20:9.
[64] Ex. "A", Woods depo., at 21:7-14.
[65] The bus stop at 303 Genesee Street was not safe for Mr. Woods to access (Ex. "A", Woods depo., at 24:1-13); the bus stop at 1703 Genesee Street is located on grass and presented a risk for Mr. Woods to tip over (Ex. "A", Woods depo., at 24:23-25:10); the stop at 350 Leland Avenue is inaccessible (Ex. "A", Woods depo., at 28:9-12).

board a Utica public bus at stops that lacked landing pads or accessible routes because he knew from his experience that it would be unsafe. A wheelchair user who encounters a retail store that has only steps leading to its entrance need not physically bump his wheels against those steps to gain standing. Mr. Woods' experiences with Defendants' bus stops is no different. Mr. Woods would use the Utica public bus if the stops were made accessible.[66] Mr. Woods has standing to obtain injunctive relief.

C. **Defendants' Failure to Provide a Reasonable Modification Constitutes Discrimination.**

Defendants' failure to provide a reasonable modification constitutes discrimination. As is set forth above, Mr. Woods attempted to resolve his accessibility concern informally by making a written request for accommodation. In response, Defendants advised Mr. Woods that he should bear the risk of injury and be dropped off in active driveways and roads.

As is discussed above, in *Bd. of Elections in City of New York*, the Second Circuit found that polling places were plagued with physical barriers and that the defendant failed to provide individuals with meaningful access to its voting program. 752 F.3d at 200-01. While the specific service at issue is different, the underlying principle is the same: physical barriers plague the bus stop system in Utica and act as a barrier that prevent Mr. Woods from using the fixed route transportation system safely and independently. This is hugely consequential because the fixed route system is a completely different than Defendants' paratransit system.[67] According to

---

[66] Ex. "A", Woods depo., at 57:9-58:6.

[67] Congress recognized that, even when a fixed route system is fully accessible some individuals' disabilities will still prevent them from using a fully accessible fixed route transportation system. Thus, paratransit is intended to serve as a 'safety net' *to ensure that these individuals have transportation available to them* on the same basis as individuals using fixed route systems." *See* Americans With Disabilities Act (ADA): Guidance, 2015 WL 6037995, at *149. Paratransit was not intended as a crux for public entities to avoid their obligation to make their fixed route transportation service accessible.

Joshua Gardener, the Defendants' manager of its paratransit department, <u>a paratransit ride can only be made in advance</u>.[68] Those who qualify for paratransit must make their appointment to be picked up and dropped off by 5:00 the day before they wish to use the paratransit system.[69] Because of this paratransit rule, wheelchair users cannot use Defendants' public transportation at a moment's notice, while able-bodied citizens can catch the bus at any time for any reason. This is a clear example of unequal treatment and discrimination that the ADA was drafted to prevent.

Defendants failed to provide meaningful access to its fixed route transportation service. Having taken no steps whatsoever to make its service accessible to Mr. Woods, summary judgment should issue in favor of Mr. Woods.

### D.     <u>Defendants' Failure to Provide Program Access Constitutes Discrimination.</u>

There is also no material dispute of fact that Defendants committed discrimination under the "program access" test of Title II of the ADA. Under the program access test, the inquiry is whether "**all services** available for the use of non-disabled patrons also are available for use of disabled patrons." *Pascuiti*, 87 F. Supp. 2d at 224 (emphasis added). Other Courts have held that the failure to provide program access to bus stops can constitute discrimination. *Falls*, No. CV 16-2499, 2017 WL 2730781, at \*4 (E.D. La. June 26, 2017); *Belinski*, 2010 WL 11596645, at \*6. Here, just as in *Falls*, given the pervasive non-compliance and Mr. Woods' individual inability to safely access the bus stops, this Court should find that, in its entirety, Mr. Woods has been denied access and is being discriminated against. The ADA and RA mandate that entities *affirmatively* evaluate the programs and services they offer and to ensure that people with disabilities will have meaningful access. *See, e.g.,* 42 U.S.C. § 12131(2); 49 C.F.R. §37.43(a)(1).

---

[68] Ex. "C", Gardener depo., at 65:13-16.
[69] Ex. "C", Gardener depo., 65:17-19.

Given Congress's unmistakable intent to create "clear, strong, consistent, [and] enforceable standards addressing discrimination against individuals with disabilities" in various aspects of life, 42 U.S.C. § 12101(b)(2), and also its recognition that "benign neglect" is a particularly pernicious form of disability discrimination. *Alexander v. Choate*, 469 U.S. 287, 295 (1985). Defendants' wholesale failure to make its bus stop system accessible constitutes discrimination and renders Defendants liable under the ADA and RA.

Plaintiff is deterred from using the fixed route bus system due to the extensive non-compliance. Plaintiff's personal account of the non-accessible nature of the bus stops is buttressed by objective evidence in the form of Mr. Nicholas Heybeck, P.E.'s report and deposition testimony. This evidence conclusively establishes that ninety-one (91%) percent of the bus stops surveyed were non-compliant.[70] Mr. Heybeck inspected one hundred fifteen (115) of Defendants' bus stops in Utica.[71] Mr. Heybeck did not inspect every single bus stop. Rather, Mr. Heybeck began by inspecting the bus stops that were the most heavily used as those stops would best represent the system in its entirety.[72]  Defendants offer no evidence that its bus stops are ADA accessible. Here, just as in *Falls*, given the pervasive non-compliance, the Court should find that Defendants' bus stop system is not accessible when it is viewed in its entirety.

Instead of attempting to controvert Mr. Wood's prima facie evidence, Defendants argue that Mr. Woods should be picked up and dropped off in active driveways, roadways, and the grass. Defendants also argue that Mr. Woods should use its paratransit service. Finally, Defendants argue that they have no obligation to modify their bus stops. Each of these arguments fail.

---

[70] Ex. "F", Heybeck report at ¶ 31.
[71] Ex. "F", Heybeck report at ¶ 2.
[72] Ex. "G", Heybeck depo., at 19:19-20:1.

1) _Defendants' "Solution"—that Mr. Woods be Pick Up and Dropped Off in Driveways and Intersections—is Unsafe and Unreasonable._

Defendants and their expert Mr. Rishel argue that Mr. Woods should be picked up and dropped off in active driveways and intersections, unprotected from vehicular traffic. This "proposal" is unsafe due to the proximity to vehicular traffic as well as the unknown slopes and conditions of those driveways and intersections. Mr. Rishel admitted that the concept behind the ADA is so that people with disabilities can have access and there can be no access without safety.[73] Mr. Rishel admitted that the purpose of the ADA is so that people with disabilities can get access in a safe manner.[74] Mr. Rishel agreed that the ADAAG spells out specific measurements of architectural features to ensure safety.[75] Mr. Rishel agreed that the ADAAG delineates the requirements for the maximum slope for a bus landing pad for safety purposes.[76] Mr. Rishel agreed that a reason why the ADAAG requires landing pads to be flat is because "we don't want wheelchair users either tipping over because it is too steep or rolling around when they take their hands off their wheels for a second."[77]

Despite knowing of these safety hazards, Defendants propose that wheelchair users should risk their safety boarding and alighting in active driveways, intersections and on grass. Furthermore, Defendants expect the wheelchair user, not the bus driver, to determine what is a safe place to board and alight.[78] In fact, according to Mr. Rishel, "Bus operators are discouraged from intervening and saying 'No, I can't do that. It's unsafe,'" except in extreme situations. We

---

[73] Ex. "I", Rishel depo., at 23:15-23.
[74] Ex. "I", Rishel depo., at 24:23-25:2.
[75] Ex. "I", Rishel depo., at 26:11-15.
[76] Ex. "I", Rishel depo., at 43:9-18.
[77] Ex. "I", Rishel depo., at 43:20-25.
[78] Ex. "I", Rishel depo., at 37:25-38:4.

are taught to defer what the passenger wants..."[79] Under Defendants' proposal, individuals with disabilities would have to "eyeball" a disembarking spot and pray that the spot is sufficiently stable, level, and free from vehicular traffic. Joshua Gardener, Defendants' employee who responded to Mr. Woods' reasonable accommodation request by saying, "if there are no safety issues present, we will accommodate courtesy stops" admitted that the safety issues he was referring to included wheelchair users getting hit by cars.[80] He admitted that there are no Centro written policies guiding bus drivers as to where these courtesy stops should be (or should not be).[81] Mr. Rishel admitted that he does not know how Defendants' bus drivers (or bus drivers in general) are trained on how to determine what is a safe or unsafe place to board and alight.[82]

Mr. Rishel admitted that when a wheelchair user "eyeballs" an area for safety, sometimes their eyeballs deceive them.[83] Mr. Rishel agreed that a wheelchair user may determine that it is safe for them to alight on grass, but that grass could have mud underneath it which could impact the usability of the grass by the wheelchair user.[84] Curiously, despite admitting that the ADAAG requirements exist to ensure safe access, Mr. Rishel refused to admit that the ADAAG requirements pertaining to specific defined accessibility standards for landing pads exist so that wheelchair do not have to make decisions about what is safe and what is not safe.[85]

The case law is clear that dangerous half-measures are not sufficient to confer "program access" to individuals with disabilities. In *Sarfaty v. City of Los Angeles*, the court held that forcing wheelchair users into the path of cyclists was discriminatory under the ADA. No. 2:17-

---

[79] Ex. "I", Rishel depo., at 38:4-10.
[80] Ex. "C", Gardener depo., at 47:18-49:5.
[81] Ex. "C", Gardener depo., at 47:4-16.
[82] Ex. "I", Rishel depo., at 40:14.
[83] Ex. "I", Rishel depo., at 49:8-15.
[84] Ex. "I", Rishel depo., at 49:17-50:4.
[85] Ex. "I", Rishel depo., at 50:10-51:5.

CV-03594-SVW-KS, 2020 WL 4697906, at *6 (C.D. Cal. Aug. 12, 2020) (finding that modifications to on-street parking constituted discrimination because it forced individuals with disabilities to "roll in the bike lane for a significant period of time" and ambulatory individuals did not face this risk). In *Parker v. Universidad de Puerto Rico*, the disabled plaintiff attended an awards ceremony held at the University. 225 F.3d 1, 3 (1st Cir. 2000). Park staff directed the plaintiff, who required a motorized wheelchair for mobility, to use a particular path to travel to a ceremony. *Id*. at 3. The plaintiff introduced evidence that the path was not designed for disabled access. *Id*. The plaintiff's wheelchair flipped over when it fell off a two-inch lip at the bottom of the path. *Id*. The court in *Parker* explained that, pursuant to the University's duty under § 35.150(b)(1) to prioritize methods of compliance that would allow it to administer its programs in "the most integrated setting appropriate," the University was required to ensure that persons with disabilities could access the ceremony site "using safe walkways, ramps, and curb cuts." *Id*. at 6–7 (internal quotation marks omitted). The court observed that the university was "not required to make every passageway in and out of the [site] accessible," but was required to provide "at least one" safe access route for a person in a wheelchair. *Id*. at 7.

2)   *Paratransit is Not a Substitute for an Accessible Fixed Route Transportation Service.*

Defendants also argue that Mr. Woods has no need for its fixed route bus system because he can use the paratransit service. This argument fails because paratransit service is a distinct service from fixed route service and, pursuant to the rules of statutory construction and Supreme Court case law, <u>each</u> service provided by a public entity must be accessible.

The regulatory guidance from the federal government and associated case law confirms that paratransit service is not the same service as fixed transportation route service. The FTA states in the preamble to the final ADA regulations: "complementary paratransit is not intended

to be a comprehensive system of transportation for individuals with disabilities."[86] The FTA

further explained in its Circular on the ADA, Chapter 8, Complementary Paratransit Service,

> "In crafting the Americans with Disabilities Act (ADA), Congress recognized that even when a fixed route transit system is fully accessible, there will be some individuals whose disabilities prevent them from using the system. Congress therefore created a "safety net" to ensure that these individuals have transportation available to them on the same basis as individuals using fixed route systems."

> *See* Americans With Disabilities Act (ADA): Guidance, 2015 WL 6037995, at *149.

To that effect, the Fifth Circuit explained that "paratransit service is meant to act as the

**disability complement** to established fixed route transportation services…" *Melton v. Dallas*

*Area Rapid Transit*, 391 F.3d 669, 675 (5th Cir.2004) (emphasis added). Some individuals have

disabilities that are so advanced that they are incapable of independently or safely using a fully

accessible fixed route system. Far from being a crux that an entity can use to avoid its obligation

to provide an accessible fixed route transportation system, paratransit service is intended to be a

complimentary service provided to disabled individuals who cannot otherwise use the fixed route

system. Defendants are obligated to ensure that both their fixed route transportation service and

their paratransit service are accessible. Paratransit is the icing on the cake. Paratransit is not the

cake. An accessible fixed-route bus service is the cake.

The above regulatory interpretation is bolstered by a plain meaning statutory

interpretation of the ADA, which mandates, *without limitation*, that public entities not

discriminate in their services, programs, or activities. The Supreme Court has explained that even

one facility can contain numerous "services" any one of which an individual with a disability

could be excluded from. *Pennsylvania Dep't of Corr. v. Yeskey*, 524 U.S. 206, 210 (1998)

---

[86] *See* Transportation for People With Disabilities, 56 Fed.Reg. at 45,601 (Sep. 6, 1991) (codified at Title 49 Part 37).

("Modern prisons provide inmates with many recreational 'activities,' medical 'services,' and educational and vocational 'programs,' all of which at least theoretically 'benefit' the prisoners (and any of which disabled prisoners could be 'excluded from participation in')."). To that end, sidewalks have been held to be a "service." *Frame v. City of Arlington*, 657 F.3d 215, 227 (5th Cir. 2011) ("Even if we focus on a public sidewalk itself, we still find that a sidewalk unambiguously is a service, program, or activity of a public entity."). Indeed, "the phrase 'services, programs, or activities' encompasses virtually everything that a public entity does" *Johnson v. City of Saline*, 151 F.3d 564, 569 (6th Cir.1998). Thus, paratransit service and fixed route service are two separate and distinct services.

Defendants' paratransit service does not operate in an equivalent manner to fixed route service. According to Joshua Gardener, Defendants' manager of the paratransit department, a paratransit ride can only be made in advance.[87] Those who qualify for paratransit must make their appointment to be picked up and dropped off by 5:00 the day before they wish to use the paratransit system.[88] Because of this rule, able-bodied citizens of Utica can catch the bus at a moment's notice. Wheelchair users who depend upon the paratransit system cannot similarly use Defendants' transportation services. This crucial distinction was confirmed by the Defendants' expert, who agreed that if a wheelchair user wanted to conduct some research at the library and made a paratransit appointment to be dropped off at the library at 8:00 am and be picked up at 5:00 pm, and that wheelchair user finished their research at 1:00 pm and wanted to go home, they would have to wait until their previously scheduled pickup time of 5:00.[89] This is because, according to Mr. Rishel, who has extensive experience with paratransit, "that is the way ADA

---

[87] Ex. "C", Gardener depo., at 65:13-16.
[88] Ex. "C", Gardener depo., at 65:17-19.
[89] Ex. "I", Rishel depo., at 82:3-23.

paratransit works."[90] Defendants' expert was also posited with the hypothetical where a wheelchair user gets picked up by a friend to go to Denny's together for a lovely brunch. However, the friend leaves for an emergency, leaving the wheelchair user at Denny's without a ride home. When asked if the wheelchair user could call Centro's paratransit to get a ride home that day, Defendants' expert answered, "I don't know."[91] However, because of the aforementioned "5:00 rule", it is obvious that the wheelchair user would be stranded at Dennys while an able-bodied citizen of Utica would be able to take the bus home.

3) *Under the Program Access Standard, a Public Entity Cannot "Do Nothing".*

Lastly, Defendants have claimed that they are not legally obligated to make structural changes because they are "grandfathered in". Defendants' statement is insufficiently general and misses the mark as the ADA obligates covered entities to provide meaningful access, be it through structural change or reasonable alternatives. See, e.g., *Pierce v. Cty. of Orange*, 526 F.3d 1190, 1219 (9th Cir. 2008) ("We agree, as a matter of law, that where reasonable alternative methods achieve compliance, structural changes to existing facilities need not be made. 28 C.F.R. § 35.150(b)(1)."). Thus, Defendants were indeed free to pursue non-structural alternatives. Either way, however, Defendants were still obligated to provide Mr. Woods with meaningful access to their fixed route transportation system. Here, the only "non-structural alternative" Defendants can point to is its *wholly unreasonable* proposal that bus drivers drop Mr. Woods off in active driveways where he is at risk of getting hit by a car.

In this case, Defendants have pursued neither structural modification nor reasonable non-structural alternatives. Just as in *Pierce*, Defendants have implemented no curative measures to combat its exclusionary barriers. 526 F.3d at 1219 (reversing judgment in favor of county where

---

[90] Ex. "I", Rishel depo., at 83:3-4.
[91] Ex. "I", Rishel depo., at 73:2-25.

the county failed to show that the physical barriers at a jail were resolved through the assistance of deputies or by "other curative methods."). Summary judgment should issue for Mr. Woods because Defendants' fixed route transportation system is exclusionary, and Defendants have not adopted any non-structural alternatives that would render this system accessible.

> **E.      Defendants' Failure to Comply with the New Construction/Alteration Requirements Constitutes Discrimination**

Summary judgment should also issue for Mr. Woods because Defendants have failed to comply with the new construction/modification requirements of the ADA. Shortly after April 1, 2015, the international symbol of accessibility was added to the signage on the physical bus stops in Utica, along with the words "ACCESSIBLE STOP".[92] Similarly, the Centro bus maps/schedules were modified in 2019 to include the international symbol of accessibility on nearly every bus stop.[93] Under the ADA, the international symbol of accessibility is important: It is mandatory at accessible entrances (ADAAG 216.6), at accessible toileting rooms (ADAAAG 216.8), accessible check-out aisles (216.11), and accessible parking spaces (ADAAG 502.6). While perhaps foundational, the purpose of the signal is to indicate to patrons that "these parking spaces are accessible; these parking spaces are not." As is set forth above, the act of designating a parking space as "accessible" is sufficient to trigger the new construction / alteration standard.

That is precisely what happened here. Defendants designated and marked their bus stops as "ACCESSIBLE," bearing the international symbol of accessibility, both on physical signage of the bus stops and on system maps distributed to patrons. **By and through these actions, Defendants triggered the "alteration" standard of the ADA and are thus obligated to**

---

[92] Ex. "K", 30(B)(6) depo., at 7:3-16. *For examples of the signage bearing the international symbol of disability along with the words "ACCESSIBLE STOP", see* Exhibit "J" Expert Report of Mike Rishel, at pages 7; 11-12; 14-15; 18-19; 21-30.
[93] Ex. "K", 30(b)(6) depo., at 18:14-19:6.; see also Exhibit "L", Bus Schedules.

**ensure that the bus stops designated as "accessible" comply with the ADA Accessibility Guidelines. Having fundamentally altered the nature of the bus stops, Defendants are obligated to ensure that the modified stops are accessible.** *Roberts*, 542 F.3d at 370.

Additionally, Defendants "altered," their bus stops when they created bus shelters in violation of the ADAAG. According to Mike Bissette, Defendants' Assistant Manager of Maintenance[94], there are twenty eight (28) bus shelters in Utica, twenty five (25) of which have been replaced in the past 17 years.[95] The only "original" bus shelters are at Utica Business Park and the Inside House.[96] According to Mr. Heybeck, the bus shelters at Armory & Adrean (end of the line)[97] Genesse & Clinton (Northbound)[98], Bleecker Centro Transit Hub (Eastbound)[99] all violate the ADAAG's requirement that the boarding and alighting area be flat. Further, Mr. Heybeck determined that the Armory & Adrean (end of the line) bus shelter did not have the sufficient boarding and alighting clear floor space.[100]

In *Frame v. City of Arlington* the Fifth Circuit held that "when a city decides to build or alter a sidewalk but makes that sidewalk inaccessible to individuals with disabilities without adequate justification, the city discriminates within the meaning of Title II." 657 F.3d 215, 230-31 (5th Cir. 2011).[101] Just as the failure to make a sidewalk accessible constitutes discrimination,

---

[94] *See* Exhibit "M", Deposition of Mike Bessette, at 7:6-8.
[95] Ex. "M", Bissette depo., at 14:14-16:17.
[96] Ex. "M", Bissette depo., at 14:14-16:17.
[97] Ex. "H", Heybeck Violations Table, at Bus stop ID #87.
[98] Ex. "H", Heybeck Violations Table, B at Bus stop ID #26.
[99] Ex. "H", Heybeck Violations Table, at Bus stop ID #35.
[100] Ex. "H", Heybeck Violations Table, at Bus stop ID #87.
[101] *Frame v. City of Arlington*, 657 F.3d 215, 228 (5th Cir. 2011) ("When a newly built or altered city sidewalk is unnecessarily made inaccessible to individuals with disabilities, those individuals are denied the benefits of safe transportation and a venerable public forum.").

the failure make bus stops accessible also constitutes discrimination.[102] There is no genuine dispute of fact that Defendants failed to comply with the alteration requirement of the ADA.

      **F.**    **Mr. Woods Experienced Discrimination by Reason of His Disability**

The only thing stopping Mr. Woods from fully utilizing Defendants' fixed route bus system are the physical barriers to access. Due to the systemic barriers, Plaintiff is not able to utilize to ride the bus in a manner that is comparable to that of non-disabled members of the general public. But for the barriers, Plaintiff would be able to meaningfully and safely utilize the bus stops and fixed route transportation in Utica. There is no material dispute of fact that Plaintiff has experienced discrimination by reason of his disability.

      **G.**    **Defendants Are Public Entities Under Title II of the ADA and Are Responsible for Their Fixed Route Transportation Service.**

Title II of the ADA applies to all public entities, which are defined to include "any State or local government" and "any department, agency, special purpose district, or other instrumentality of a State or States or local government[.] 42 U.S.C. § 12131(1). Here, CENTRO is established by state law, is an "authority," and this authority shall be regarded "as performing an essential governmental function." *See* N.Y. Pub. Auth. Law § 1329 ("1. The purposes of the authority shall be the continuance, further development and improvement of transportation and other services related thereto within the transportation district, by railroad, omnibus, marine and air, in accordance with the provisions of this title. 2. It is hereby found and declared that such purposes are in all respects for the benefit of the people of the state of New York and the authority shall be regarded as performing an essential governmental function in carrying out its purposes and in exercising the powers granted by this title."). Indeed, in another Title II case

---

[102] 49 C.F.R. §37.43(a)(1) (requiring that the altered portion of a facility be readily accessible to and usable by individuals with disabilities to the maximum extent feasible).

Centro did not object to the Court finding that it was covered by Title II. *Hulett v. City of Syracuse*, 253 F. Supp. 3d 462, 483 (N.D.N.Y. 2017). There is no doubt that Centro is a public entity and, thus, is covered by Title II of the ADA.

Mr. Woods anticipates that Defendants may also argue that they do not "own the land" on which the bus stops are situated. Ultimately, however, ownership of the land is immaterial as the ADA specifically charges that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C.§ 12132. Federal law specifically mandates that no qualified individual with a disability shall be excluded from a public entity's services. There is no "exception" stating that a public entity can escape liability under the ADA by providing its service on land owned by another. This Court should not engraft an exception. See, e.g., *Ross v. Blake*, 578 U.S. 1174, 136 S. Ct. 1850, 1862 (2016) (explaining in a Prison Litigation Reform Act case that "Courts may not engraft an unwritten 'special circumstances' exception onto the PLRA's exhaustion requirement.")

Mr. Woods cannot meaningfully access the fixed route bus system offered by Defendants in Utica. Defendants' express purpose is the continuance, development, and improvement of this public transportation service. Defendants' failure to provide Mr. Woods with meaningful access to the fixed route transportation service is squarely and solely Defendants' responsibility.

H.    **Defendants are The Recipients of Federal Funds and Thus are Covered by the Rehabilitation Act.**

To prevail on his claim under the Rehabilitation Act, Mr. Woods must also show that Defendants are the recipients of federal funds. *U.S. Dep't of Transp. v. Paralyzed Veterans of Am.*, 477 U.S. 597, 605 (1986) ("Congress limited the scope of § 504 to those who actually 'receive' federal financial assistance because it sought to impose § 504 coverage as a form of

33

contractual cost of the recipient's agreement to accept the federal funds.").[103] Congress made clear in the Civil Rights Restoration Act of 1987 that immunity waiver under § 504 is intended to be expansive. See Civil Rights Restoration Act of 1987, Pub. L. No. 100-259, sec. 4, 102 Stat. 28, 29 (1988) (codified at 29 U.S.C. § 794) ("1988 Amendments"). Under the amended Rehabilitation Act, Congress defined "program or activity" to mean "*all* of the operations of a department, agency, special purpose district, or other instrumentality of a State or of a local government ... *any part of which* is extended Federal financial assistance." 29 U.S.C. § 794(b) (emphasis added). Here, Defendants are the unequivocal recipients of federal funds as Joseph DeGray, Centro's Senior Vice President of Operations stated so during his deposition.[104]

## V.    CONCLUSION

For the reasons stated above, summary judgment should issue in favor of Mr. Woods.

Respectfully Submitted

| CERTIFICATE OF SERVICE | **Bizer & DeReus** |

**CERTIFICATE OF SERVICE**
    I hereby certify that the foregoing pleading has been delivered to all counsel of record on September 17, 2021, by EFC filing.

By: */s/ Andrew D. Bizer*
    ANDREW D. BIZER

**Bizer & DeReus**
*Attorneys for Plaintiffs*
Andrew D. Bizer (NY # 520676)
andrew@bizerlaw.com
3319 St. Claude Ave.
New Orleans, LA 70117
T: 504-619-9999; F: 504-948-9996

By: */s/ Andrew D. Bizer*
    ANDREW D. BIZER

---

[103] While the Rehabilitation Act only applies to the receipts of federal funds, Title II of the Americans with Disabilities Act applies to all governmental entities.
[104] Ex. "D", DeGray depo., at 28:6-8.