UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

TRAVIS WOODS,
an individual,

                            Plaintiff,

v.                                                    Case No.: 6:20-cv-539 (FJS/ATB)

CENTRO OF ONEIDA, INC.,
CENTRAL NEW YORK REGIONAL
TRANSPORTATION AUTHORITY,

                            Defendants.

_____

## RESPONSE TO PLAINTIFF'S STATEMENT OF MATERIAL FACTS

Defendants CENTRO OF ONEIDA, INC. and CENTRAL NEW YORK REGIONAL

TRANSPORTATION AUTHORITY (collectively "Centro" or "Defendants"), by and through

their attorneys Mackenzie Hughes LLP, hereby respond, pursuant to Fed. R. Civ. P. 56 and Local

Rule 56.1, to Plaintiff TRAVIS WOODS' ("Woods" or "Plaintiff") Statement of Material Facts

as follows:

1.    Travis Woods is a T-4 paraplegic due to a gunshot wound to his back.

      **Admit.**

2.    The bullet is still lodged in his spinal cord to this day.

      **Admit.**

3.    Mr. Woods cannot walk or stand and uses a wheelchair for mobility.

      **Admit.**

4.    Despite this, Mr. Woods prides himself on his independence.

      **Admit.**

5.     Mr. Woods also prides himself on born and raised in Utica.

**Admit.**

6.     Mr. Woods has family members throughout Utica.

**Admit.**

7.     Because of his independent travels around Utica, Mr. Woods is aware of the lack of

safe, accessible landing pads by which to board and alight the Centro fixed-route bus

system.

**Deny.** At his deposition Woods claimed that the bus stops were inaccessible, however

he could not recall a specific instance in which he wanted to use the fixed route system

and was unable to do so because of the lack of landing pads, he could not recall a

specific instance when he inspected the bus stops listed in his complaint, and he could

not recall why each of the bus stops listed in his complaint are inaccessible aside from

the conclusory allegation that they do not have landing pads. *See* Woods Tr. (Hunt Aff.

ex. J) at 19:5, 20:6, 21:20, 22:11-12, 23:11, 24:4-8, 25:9-10, 28:22.

8.     Mr. Woods was born in Utica and has lived there his whole life.

**Admit.**

9.     Mr. Woods has been a passenger on a Utica public bus approximately once in the last

year.

**Deny.** At his deposition, Woods gave conflicting testimony on whether he has ever been

a passenger on a Centro bus. At the beginning of his deposition, Plaintiff claimed that he

rode the bus once to McDonalds. *See* Woods Tr. 14:4-7. However, later on in the

deposition, Plaintiff testified that he has no recollection of riding a Centro bus, ever. *Id.*

29:24-30:8. Then at another point, he stated that he visited bus stops to check for

landing pads after his trip to McDonalds. *Id.* 17:19-20, 19:3-8, 23:9-14.

10. Specifically, Mr. Woods was taking the bus to a McDonalds.

**Deny.** For the reasons stated *supra*, there is conflicting testimony on whether Woods has ever taken a Centro bus.

11. When Mr. Woods was departing the bus, he was dropped off on the driveway of the McDonalds instead of at the bus stop.

**Deny.** For the reasons stated *supra*, there is conflicting testimony as to whether Woods has ever taken a Centro bus.

12. Mr. Woods was not independently able to get out of the driveway without the assistance of his friend who was accompanying him.

**Deny.** For the reasons stated *supra*, there is conflicting testimony as to whether Woods has ever taken a Centro bus. Additionally, there is conflicting evidence as to whether Woods would be able to get out a driveway unassisted, given the gentle slope of the driveway at issue and the fact that he also testified that he can "do miles in this chair." *See* Woods Tr. 23:17-21; Rishel Report (ex. A to Rishel Aff.) at 11.

13. Mr. Woods tried to access a Utica public bus at the stop located in the 900 block of Mathews Avenue, but was unable to use that bus stop because it did not have a landing pad.

**Deny.** At his deposition Woods was unable to recall when he attempted to access the bus stop at 900 Matthews Avenue or explain why he was unable to access it. *See* Woods Tr. 19:3-20:6.

14. Once Mr. Woods determined that he could not access the bus at that location, he did not make further attempts because he determined that it would be dangerous.

**Deny.** It is unclear from Woods' vague and conflicting testimony whether he ever visited the bus stop at 900 Matthews Avenue or if he took any factors other than the lack of a concrete landing pad into consideration. *See* Woods Tr. 19:3-20:6.

15.    Mr. Woods was unable to even physically get to the bus stop because it was located on a grassy surface.

**Deny.** Woods' testimony on as to why he was unable to board the bus at 900 Matthews Avenue, assuming he even attempted to do so, was vague and conclusory. *See* Woods Tr. 19:3-20:6.

16.    Mr. Woods also attempted to use the bus stop at 1 Herkimer Road, but was again unable to access the stop because there was a hole blocking his path.

**Deny.** Again, Plaintiff's testimony as to whether he ever attempted to use the bus stop at 1 Herkimer Road is contradictory and vague. At one point Plaintiff stated that he was unable to access the bus stop because there was "grass or something." *See* Woods Tr. 22:9-13. While at another point he blamed it on a hole blocking his path. *Id.* 21:7-10.

17.    Mr. Woods has personally encountered several additional bus stops in Utica that lacked landing pads and would be dangerous for him to access.

**Deny.** Again, there is vague and contradictory testimony on whether Woods has ever attempted to ride a Centro bus. *See* Woods Tr. 24:1-18.

18.    The lack of accessible landing pads have prevented, and are currently preventing Mr. Woods from using the fixed route bus system in Utica. In his deposition, Mr. Woods summed it up succinctly:

    "There's no landing pad…you have to have one there. There's

{M0839785.2}                                    4

nothing there but danger. That's what you get from all these bus stops. That's why I can't continue on getting on the bus stop. If the bus stops was correct for me to get on there, I would continue on."

**Admit in part and deny in part.** Centro admits that Woods made the statement quoted, however Centro denies that landing pads are the reason why Plaintiff does not utilize Defendants' fixed route system, given Woods' lack of use of Centro's bus system. Woods Dep. at 13-19, 25, 29-30.

19. According to Mr. Woods, "the bus stops are like distant islands. You can't get to it."

**Admit.** Centro admits that Woods made the above statement.

20. Frustrated with the bus stops that were completely lacking landing pads, on April 3, 2020, Mr. Woods made a reasonable accommodation request to the Defendants via email (the "Reasonable Accommodation Request").

"I am a qualified individual with a disability under Title II of the ADA, 42 U.S.C. § 12131 et seq., and the Rehabilitation Act, 29 U.S.C. § 794, et seq. I am paraplegic and am substantially impaired in major life activities. I require a wheelchair for mobility. This is a request for a reasonable accommodation.

Please be advised that there is widespread non-compliance with the ADA and RA when it comes to the landing pads at the CNYRTA bus stops. To be clear: most of the bus stops I have encountered either do not have big enough landing pads or have no landing pads at all, in violation of the ADA and RA. A few examples in Utica include: the bus

stop at by my doctor, Dr. Kodsy, at 1703 Genesee Street; the bus stop at

my pharmacy Parkway Drugs, at 350 Leland Ave; all the bus stops that

serve Proctor Park; the bus stop at the 900 block of Matthews Avenue

where many of my friends live; and the bus stop near the McDonalds

near my apartment located at 171 N. Genesee St.

   It has been nearly 30 years since the passage of the ADA. I expect that

you will remedy the ADA violations and bring the landing pads into

compliance with the requirements, provisions, and regulations of the ADA

and the Rehabilitation Act within thirty (30) days."

**Admit in part.** Centro admits that Woods sent the above email but denies

the alleged reason for the email, given Woods' lack of interest in riding the

bus.  Woods Dep. at 13-19, 25, 29-30.

21.    Mr. Woods would use the Utica public bus if the stops were made accessible.

**Deny.** There is no evidence that Woods would utilize Centro's fixed route system if the

stops were made accessible. Plaintiff has no recollection of utilizing Centro's fixed

route system, ever. *See* Woods Tr. 30:5-8. He has no recollection of when he has ever

tried to access the bus stops listed in his complaint. *See id.* at 19:5, 21:20, 23:11, 25:9-

10, 28:22, 17:19-20. Or why he was unable to access them. *See id.* at 24:1-18. He has

no interest in utilizing Centro's paratransit system, even though it is accessible to

individuals in wheelchairs. *See id.* at 35:15-18, 36:3-8. And he is already able to get

around Utica by relying on his friends and fiancée. *See id.* at 52-53. Thus, there is no

evidence that Woods would use Centro's fixed route system even if concrete landing

pads were installed.

22.    The bus stops identified in the Reasonable Accommodation Request were all bus stops that Mr. Woods personally tried to access, but could not because they lacked landing pads.

    **Deny.** As stated above, Woods' testimony on when and whether he tried to access the bus stops listed in his Reasonable Accommodation Request is vague and contradictory. Woods Tr. 19:5, 21:20, 23:11, 25:9-10, 28:22, 17:19-20. Therefore, there is no way of knowing if he personally visited each stop and no basis for the claim that he actually tried to access the stops.

23.    The Reasonable Accommodation Request ended up on the desk of Joshua Gardener, the Defendants' ADA Complaint Officer.

    **Admit,** but the name is spelled Gardner.

24.    Mr. Gardener is also the Specialized Transportation Manager who manages the paratransit department.

    **Admit,** but his name is spelled Gardner.

25.    Mr. Gardener did not physically go to the bus stops identified in the Reasonable Accommodation Request.

    **Admit,** but his name is spelled Gardner.

26.    Instead, Mr. Gardener went to Google Maps and determined that "there were safe locations to let the customer off that were near the bus stop."

    **Admit,** but his name is spelled Gardner.

27.    Mr. Gardener did not examine the bus stops to see if there existed landing pads or if the landing pads were the proper size.

    **Deny.** Gardner examined the bus stops including what he understood as landing pads

online.  Gardner Dep. (Hunt Aff. ex. H) at 29-33.

28.   Mr. Gardener determined that not all stops have to have landing pads because he believed they were "grandfathered in."

**Deny.**  At his deposition, Gardner gave his non-lawyer's "understanding" regarding certain issues under the ADA.  Gardner Dep. at 30.

29.   In the face of Mr. Woods' Reasonable Accommodation Request that claimed that there was "widespread noncompliance with the ADA", Mr. Gardener took no additional steps to determine if there was indeed "widespread noncompliance with the ADA".

**Admit.**  Gardner and Centro reasonably understood that their system was compliant with the ADA.  Gardner Dep. (Hunt Aff. ex. H) at 59-60; DeGray Dep. (Hunt Aff. ex. I) at 51.

30.   Mr. Gardener only briefly discussed his response to the Reasonable Accommodation Request with Joe DeGray, the Senior Vice President of Operations.

**Admit.**

31.   Mr. DeGray admitted in his deposition that he does not know what makes a bus stop ADA compliant.

**Deny.**  DeGray stated in his deposition that he had no "direct knowledge" on this issue at the time of his deposition.  DeGray Dep. (Hunt Aff. ex. I) at 17.

32.   Mr. DeGray could not even identify what a bus landing pad was.

**Deny.**  DeGray stated in his deposition that he could not answer the question as asked by Plaintiff's counsel.  DeGray Dep. at 18.

33.   After doing next to no research to confirm or deny Mr. Wood's claims of "widespread noncompliance with the ADA," on April 20, 2020, Mr. Gardener responded to Mr.

Woods. His response was:

> "We have received your ADA complaint regarding accessible landing pads at specific bus stops in Utica. At a few of these sites, there are curb cuts within feet of the bus stop where drivers can put the ramp down and allow for safe entering and exiting of the vehicle. At a few of the other locations, there are no sidewalks. In cases like these, drivers can drop off at the driveway entrance of the location. For example, at Parkway Drugs there is no sidewalk. At this location, we can have the driver stop at the driveway entrance to let you off. We also allow for courtesy stops along the route. If you would like to be dropped off somewhere other than the stop, please ask the driver when boarding the vehicle. If there are no safety issues present, we will accommodate courtesy stops."

**Admit in part.** Centro admits that Mr. Gardner made the above-quoted statement in an email to Plaintiff but denies the characterization of Mr. Gardner's research. Gardner Dep. at 26-33, 59.

34. Mr. Woods' claim that there was "widespread noncompliance with the ADA" was confirmed by Mr. Woods' expert, Nicholas Heybeck. On September 23 and 24 of 2020, Mr. Heybeck inspected one hundred fifteen (115) of Defendants' bus stops in Utica.

**Deny.** Mr. Heybeck's inspection was limited to whether Centro's bus stops complied with the ADA's requirements for new construction, however he did not assess whether the bus stops were in fact new construction subject to those requirements. *See* Heybeck

Dep. (Hunt Aff. ex. O) at 31.

35.    Mr. Heybeck did not inspect every single bus stop. Rather, Mr. Heybeck began by

inspecting the bus stops that were the most heavily used as those stops would best

represent the system in its entirety.

**Deny in part.**  This paragraph states Heybeck's intention, but Centro denies that the

most heavily used stops would best represent the system in its entirety.  Rishel Report

(ex. A to Rishel Aff.) at 37.

36.    He then moved onto a sampling of the bus stops in a more residential area towards the

ends of the bus lines.

**Admit.**

37.    At each bus stop he inspected, Mr. Heybeck would look to determine what type of

features were located at the bus stop and document those features or lack of features.

**Admit.**

38.    He looked to see if the bus stop had an adjacent sidewalk, if there was a boarding and

alighting area, and if there was a shelter and then determined whether those features

met the scoping and technical standards of the ADA.

**Deny in part.** Centro denies to the extent that Mr. Heybeck did not determine whether

the bus stops inspected were new construction, which is relevant to whether they fall

within the scope of the ADA's rules for "new construction." *See* Heybeck Tr. 31.

39.    Mr. Heybeck wrote in his expert report:

"After inspecting and taking measurements of the Defendant's

bus stops, **it is my opinion that 105 of the 115 or 91% of the bus**

**stops inspected do not meet the technical specifications set forth by**

**the USDOT and Federal Highway Authority.** It is my further opinion that the bus stops contain a number of barriers that deviate significantly from what the ADA proscribes, as evidenced by "Exhibit B". Based on the high percentage of non-compliance observed, it is my opinion that the bus stop program, when viewed in its entirety does not meet the design and scoping standards of the ADA." (emphasis original).

    **Admit.** Centro admits only that Mr. Heybeck included the above-quoted provision in his expert report.

40.    There are numerous bus stops throughout the City of Utica which are entirely lacking a landing pad, as is set forth in 2006 Americans with Disabilities Act (ADA) Standards for Transportation Facilities, Adopted by the U.S. Department of Transportation, Sections 810.2.1 and 810.2.2.

    **Deny.** Centro notes that Plaintiff provides no record citation for this allegation. Whether bus stops comply with the ADA is a legal issue.

41.    Defendants hired David Rishel as their expert in an effort to rebut Mr. Heybeck. Mr. Rishel has never been admitted as an expert in Federal Court. According to Mr. Rishel, he has, "never done more than a deposition."

    **Deny in part.** Centro denies hiring Rishel solely to rebut Heybeck. Centro admits that Rishel has not testified in a federal court trial.

42.    Mr. Rishel did not dispute any of Mr. Heybeck's measurements pertaining to the bus stops.

    **Admit.**

43.    Mr. Rishel did not go out and inspect the bus stops and take any measurements.

**Deny.** Rishel went to Utica and inspected the bus stops twice. Rishel Report (Rishel Aff. ex A) at 1, 10-31.

44.    In Mr. Rishel's report, he speculates that Mr. Heybeck's slope measurements could be incorrect due to debris, however in his deposition, Mr. Rishel admitted that he could not tell from Mr. Heybeck's photos if there was indeed debris impacting the slope measurements.

**Deny in part.** Rishel did not speculate but raised questions about the validity of Heybeck's measurements based on his own experience and knowledge. Rishel Report at 37.

45.    Mr. Rishel offered no alternative measurements to dispute Mr. Heybeck's measurements.

**Admit.**

46.    Mr. Rishel did not analyze whether Centro had the sufficient funds to install compliant landing pads and did not analyze whether Centro had the ability to raise the sufficient funds to install compliant bus stops.

**Admit.**

47.    Mr. Rishel did nothing to determine whether Centro can or cannot bring their bus stops in compliance with the ADA.

**Deny.** Rishel concluded that Centro's system complies with the ADA. Rishel Report at 3-4.

48.    Mr. Rishel did no research as what entity owns the land surrounding the bus stops in Utica.

**Admit.**

49.    In his expert report and in his deposition, Mr. Rishel made numerous "suggestions" as to the intersections and driveways that the wheelchair users could board and alight when faced with the lack of landing pads.

**Deny.**  Rishel provided his expert opinion as to suitable boarding and alighting areas. Rishel Report at 10-31.

50.    However, Mr. Rishel did not take any measurements of those driveways and intersections to determine whether they were safe – he did nothing to determine if the driveways and intersections contained excessive slopes, debris, or were free from uneven changes in level.

**Deny in part.**  Rishel did not take measurements but did inspect the bus stops and made safety determinations regarding the areas where an individual that uses a wheelchair could safely board or alight, taking into account factors such as proximity to the sidewalk, access to pedestrian ramps or curb cuts, and protection from the roadway. Rishel Report 11, 12, 16, 17, 18, 19, 20, 22, 23, 24, 26, 27, 28, 30.

51.    Defendants' expert admitted that the purpose behind the ADA is so that people with disabilities can have access and there can be no access without safety.

**Admit.**

52.    Defendants' expert agreed that the purpose of the ADA is so that people with disabilities can get access in a safe manner.

**Admit in part.**  Rishel stated in his deposition that this is true "in a highly generalized way."  Rishel Dep. at 25.

53.    Defendants' expert agreed that the ADAAG spells out has specific measurements of architectural features to ensure safety.

**Admit in part.** At his deposition, Mr. Rishel was asked, "Philosophically you would agree that the ADAAG has specific numbers for safety purposes?" In response, Mr. Rishel stated, "Again, in an incredibly broad sense, yes." Rishel Tr. 26:11-15.

54.    Defendants' expert agreed that the ADAAG delineates the requirements for the maximum slope for a bus landing pad for safety purposes.

**Admit in part.** At his deposition, Mr. Rishel was asked, "And so the idea is for safety purposes, wouldn't you agree, that the reason why there is an X percentage listed as to what the maximum level for a bus stop can be is because it's a safety matter." In response, Mr. Rishel stated, "Again, I would partly agree in a very generalized sense." Rishel Tr. 43:9-13, 43:17-18.

55.    Defendants' expert agreed that a reason why the ADAAG requires landing pads to be flat is because "we don't want wheelchair users either tipping over because it is too steep or rolling around when they take their hands off their wheels for a second."

**Admit,** but the quote is from Plaintiff's counsel, not Rishel.

56.    Defendants expect the wheelchair user, not the bus driver, to determine what is a safe place to board and alight and what is not.

**Deny in part.** Centro's drivers are trained to consider safety in determining locations for boarding and alighting. Gardner Dep. at 47-49.

57.    In fact, according to the Defendants' expert, "Bus operators are discouraged from intervening and saying 'No, I can't do that. It's unsafe," except in extreme situations. We are taught to defer what the passenger wants..."

**Admit in part.** Rishel was discussing bus operators in general, not Centro in particular. Furthermore, the FTA Circular provides that: "Individuals with disabilities

also have the right to decide the level of risk they are willing to take to travel independently." Hunt Aff. ex. R at 2-2.

58.    Defendants' expert admitted that there are no Centro written policies guiding bus drivers as to where these courtesy stops should be (or should not be).

**Admit.**

59.    Defendants' expert admitted that he does not know how Defendants' bus drivers (or bus drivers in general) are trained on how to determine what is a safe or unsafe place to board and alight.

**Deny.** Rishel's answer to this question was not no; it was: "Not in detail." Rishel Dep. at 40.

60.    Furthermore, Defendants' expert admitted that when a wheelchair user "eyeballs" an area for safety, sometimes that wheelchair user's eyeballs can deceive them.

**Admit in part.** Rishel said this was "a possibility." Rishel Dep. at 50.

61.    Defendants' expert agreed that a wheelchair user may determine that it is safe for them to alight on grass, but that grass could have mud underneath it which could impact the usability of the grass by the wheelchair user.

**Admit.** Furthermore, the FTA Circular provides that: "Individuals with disabilities also have the right to decide the level of risk they are willing to take to travel independently." Hunt Aff. ex. R at 2-2.

62.    Despite admitting that the ADAAG requirements exist to ensure safe access, Defendants' expert refused to admit that the ADAAG requirements pertaining to specific defined accessibility standards for landing pads exist so that wheelchair do not have to make decisions about what is safe and what is not safe.

**Admit.** Furthermore, the FTA Circular provides that: "Individuals with disabilities also have the right to decide the level of risk they are willing to take to travel independently." Hunt Aff. ex. R at 2-2.

63. In a 30(b)(6) deposition, Joseph DeGray admitted that shorty after April 1, 2015, the international symbol of accessibility was added to the signage on the physical bus stops in Utica.

   **Deny.** The symbol was added in 2005. DeGray 30(b)(6) Dep. at 7.

64. The corporate representative could not identify any efforts that were made to determine whether the bus stops actually meet the requirements of the ADA.

   **Admit** with respect to Centro's 2005 replacement of bus stop signs**.**

65. The corporate representative claimed that the international symbol of accessibility was put on the bus stops to indicate that the *busses*, not the actual bus stop, were accessible.

   **Admit.**

66. Similarly, the Centro bus maps and schedules were modified in 2019 to include the international symbol of accessibility on nearly every single bus stop.

   **Admit.**

67. According to the same corporate representative, the symbols of accessibility next to the bus stops on the maps do not imply that those bus stops are accessible.

   **Admit.**

68. Rather, "They are being listed as a reference to the accessibility on the back page of the schedule, which says that all vehicles we own are accessible."

   **Admit.**

69. According to Joshua Gardener, the Defendants' manager of its paratransit department,

a paratransit ride can only be made in advance.

**Admit.**

70.     Those who qualify for paratransit must make their appointment to be picked up and

dropped off by 5:00 the day before they wish to use the paratransit system.

**Deny in part.** Consistent with federal ADA paratransit regulations, paratransit riders

must make a reservation the day prior to the scheduled trip in order to be guaranteed

access to a ride. *See* Gardner Aff. ¶ 10. However, Centro does allow for same-day

service depending on the nature of the trip and vehicle availability. *See id.* at ¶ 11.

71.     The Defendants' expert, who agreed that if a wheelchair user wanted to conduct some

research at the library and made a paratransit appointment to be dropped off at the

library at 8:00 am and be picked up at 5:00 pm, and that wheelchair user finished their

research at 1:00 pm and wanted to go home, they would have to wait until their

previously scheduled pickup time of 5:00.71 This is because, "that is the way ADA

paratransit works."

**Deny in part.** At his deposition, Mr. Rishel was asked, "And if they got their research

done quickly and here it is 1:00 and they want to go home, they would have to wait

until their previously scheduled pickup time, correct?" In response, Mr. Rishel stated,

"According to the policy, yes. In practice, many systems will make an earlier pickup. I

can't say whether Centro would do that or not." Rishel Tr. 82:18-83:1.

72.     Defendants' expert was also posited with the hypothetical where a wheelchair user gets

picked up by a friend and they go to Denny's together for a lovely brunch. However,

the friend leaves for an emergency, leaving the wheelchair user at Denny's without a

ride home. When asked if the wheelchair user could call Centro's paratransit to get a

ride home that day, Defendants' expert answered, "I don't know."

**Admit.**

73.     Defendants are the unequivocal recipients of federal funds as Joseph DeGray, Centro's

Senior Vice President of Operations stated so during his deposition.

**Admit.**

Dated: October 15, 2021                              **MACKENZIE HUGHES LLP**

                                                     By: */s/* W. Bradley Hunt
                                                            W. Bradley Hunt
                                                            Bar Roll No. 512811
                                                            bhunt@mackenziehughes.com
                                                            Christian P. Jones
                                                            Bar Roll No. 508467
                                                            cjones@mackenziehughes.com
                                                     Attorneys for Defendants Centro of Oneida,
                                                     Inc., and Central New York Regional
                                                     Transportation Authority
                                                     440 S. Warren Street, Suite 400
                                                     Syracuse, NY 13202
                                                     Tel. (315) 233-8233
                                                     Fax. (315) 474-6409